JONATHAN WOOD,* D.C. Bar No. 1045015
E-mail: jw@pacificlegal.org
TODD F. GAZIANO,* Tex. Bar No. 07742200
E-mail: tfg@pacificlegal.org
Pacific Legal Foundation
3033 Wilson Blvd., Suite 700
Arlington, Virginia 22201
Telephone: (202) 888-6881

DAMIEN M. SCHIFF,* Cal. Bar No. 235101
E-mail: dms@pacificlegal.org
JOHANNA B. TALCOTT,* Cal. Bar No. 311491
E-mail: jbt@pacificlegal.org
JOSHUA P. THOMPSON, Cal. Bar No. 250955
E-mail: jpt@pacificlegal.org
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111

**Pro Hac Vice* pending

Attorneys for Plaintiffs

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

MASSACHUSETTS LOBSTERMEN'S ASSOCIATION
8 Otis Place
Scituate, Massachusetts 02066

ATLANTIC OFFSHORE LOBSTERMEN'S ASSOCIATION
221 Third Street
Newport, Rhode Island 02840

LONG ISLAND COMMERCIAL FISHING ASSOCIATION
P.O. Box 191
Montauk, New York 11954

GARDEN STATE SEAFOOD ASSOCIATION,
212 West State Street
Trenton, New Jersey 08608

RHODE ISLAND FISHERMEN'S ALLIANCE
P.O. Box 337
East Greenwich, Rhode Island 02818

Plaintiffs,

v.

No. ____________________

WILBUR J. ROSS, JR., in his official capacity as Secretary of Department of Commerce
1401 Constitution Ave. NW
Washington, DC 20230

BENJAMIN FRIEDMAN, in his official capacity as Deputy Undersecretary for Operations for the National Oceanic and Atmospheric Association
1401 Constitution Ave. NW, Room 5128
Washington, DC 20230

RYAN ZINKE, in his official capacity as Secretary of the Department of Interior
1849 C Street, NW
Washington, DC 20240

DONALD J. TRUMP, in his official capacity as President of the United States
1600 Pennsylvania Ave. NW
Washington, DC 20006

JANE DOE, in her official capacity as Chairman for the Council on Environmental Quality,
722 Jackson Place NW
Washington, DC 20506

Defendants.

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

## COMPLAINT

### Introduction

1. The Antiquities Act of 1906 authorizes the President to declare historic artifacts, historic landmarks, and other objects of historic or scientific interest "situated upon the lands owned or controlled by the Government of the United States" as national monuments. The President may also reserve "parcels of land" for a monument's protection. These lands must be limited to "the smallest area compatible with proper care and management of the objects to be protected."

2. On September 15, 2016, the President declared an approximately 5,000 square mile—roughly the size of Connecticut—area of the Atlantic Ocean to be the Northeast Canyons and Seamounts National Marine Monument. This area lies 130 miles from the New England coast

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

and has been an important commercial fishery for decades. Under the President's unilateral declaration, the entire area is off-limits to many commercial fishermen, with the rest ejected after seven years.

3. In declaring the monument, the President exceeded his power under the Antiquities Act. The ocean is not "land owned or controlled by the Federal government" and, thus, is not within the President's monument proclaiming authority. Even if the President could lawfully declare monuments beyond the United States' territorial sea, this 5,000 square mile monument would nonetheless violate the Antiquities Act because it is not the smallest area compatible with protecting the canyons and seamounts on which it is purportedly based.

4. Therefore, the Massachusetts Lobstermen's Association, Atlantic Offshore Lobstermen's Association, Long Island Commercial Fishing Association, Garden State Seafood Association, and Rhode Island Fishermen's Alliance ask this Court to declare the designation unlawful and enjoin enforcement of its regulations and prohibitions against fishing.

**Jurisdiction and Venue**

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); § 2201 (authorizing declaratory relief); and § 2202 (authorizing injunctive relief).

6. Venue is proper under 28 U.S.C. § 1391(b), because at least one defendant resides in this district and a substantial part of the events giving rise to this complaint occurred here.

**Parties**

*Plaintiffs*

7. The Massachusetts Lobstermen's Association was established in 1963 to represent the interests of its 1,800 members and the fishery on which their livelihoods depend. Its mission reflects the interdependence of species conservation and a thriving lobster fishery. The association actively engages with state and regional government agencies to sustainably manage the ecosystem. For instance, it has helped the industry shift equipment to reduce incidental impacts on whales. It also worked with fishery management agencies to reduce the number of traps in the region by 30% and, prior to the monument designation, was working to reduce traps by another

25%. The association also educates its members on best practices and regulatory issues through a monthly newspaper and social media. And the association serves as the voice of the Massachusetts lobster industry in the state legislature and regulatory agencies. As the representative of the Massachusetts' lobstermen, the association, through this lawsuit, seeks to protect its members' interests germane to its purposes. *Cf. Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333 (1977) (standard for organizations to bring lawsuits on behalf of their members in a representative capacity).

8. The Massachusetts Lobstermen's Association members would have standing to challenge the monument in their own right but their participation is not required for this lawsuit. *Cf. id*. The association has approximately 250 members who will be adversely affected, directly or indirectly, by the monument. It will deplete the value of some of the lobstermen's permits—a key part of these small businesses' value—put more pressure on the fisheries left open to fishermen, and impact coastal businesses that depend on a productive lobster industry, including marinas, bait dealers, mechanics, processors, and restaurants. Based on the significant impacts this monument will have on the industry, the association spoke out against it in the only public town hall held on the proposal. It also signed onto letters opposing the monument as bad for the economy, the environment, and exceeding the President's power under the Antiquities Act.

9. The Atlantic Offshore Lobstermen's Association was founded in 1973 to sustain and enhance the offshore lobster fishery. Its membership includes the owners of 45% of the permits for offshore lobster and Jonah crab and 57% of the total traps for these species. It also represents dozens of shoreside businesses related to this industry. The association educates its members and the public about issues affecting the offshore lobster fishery. It also supports efforts to improve the resource, protect habitat, and other conservation efforts that benefit the lobster industry. As the representative of the East Coast's lobstermen, the association, through this lawsuit, seeks to protect its members' interests germane to its purposes. *Cf. Hunt*, 432 U.S. 333.

10. The Atlantic Offshore Lobstermen's Association's members would have standing to challenge the monument but their individual participation is not required for this lawsuit. *Cf. id*. The monument designation will displace over 11,000 lobster traps used by members of the Atlantic

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

Offshore Lobstermen's Association. These traps are hauled in weekly, year-round and are thus an important source of employment and income for the industry. The association estimates the impact on the industry will be $3 million. The displacement of these traps will cause severe disruption to the industry and the environment. It will increase conflicts with other gear as lobstermen invade other fisheries. Although the lobster fishery in the Gulf of Maine/Georges Bank is healthier than the Southern New England lobster fishery, this displacement will put further pressure on that fishery.

11. The Long Island Commercial Fishing Association has represented Long Island's commercial fishermen since 2001. Its members include more than 150 businesses, boats, or individual fishermen who fish for a variety of species. The Long Island Commercial Fishing Association's trawl and longline fishermen have been injured by the monument declaration, which forbids them from fishing in the area. Previously, this was an important area for New York's fluke, whiting, squid, swordfish, and tuna fishermen. Prior to the monument's declaration, the Association's leaders and members met with members of the Council on Environmental Quality to discuss the adverse impacts the monument would have on their industry and individual members. The association estimates that the loss to New York fishermen alone will be $1.6 million per year. But these impacts are further multiplied when you consider impacts to shoreside businesses related to the fishermen, like marinas and restaurants. As the representative of Long Island's commercial fishermen, the association, through this lawsuit, seeks to protect its members interests germane to its purposes. *Cf. Hunt*, 432 U.S. 333. The association's member would have standing to challenge the monument, but their individual participation is not required for this lawsuit. *Cf. id*.

12. The Garden State Seafood Association represents the interests of New Jersey fishermen and fishery dependent businesses. It is active on regulatory issues at both the state and federal level and helps to coordinate fishing industry representatives throughout the country. Founded in 1999, Garden State Seafood Association is a trade association for New Jersey's commercial fishing industry. Its 200 members include fishing vessel owners and operators throughout the state, from Belford to Cape May. The Association works with local, state, and

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

federal governments, researches, and others to promote the continued sustainability of New Jersey's $100 million commercial fishing industry. It has also played a key role in working with regulators to ensure that commercial fishing not have adverse environmental consequences. In particular, it has worked with the Mid-Atlantic Fishery Management Council to develop a rule to protect deep-sea coral in that region, while maintaining a productive fishery.

13. Founded in 2007, the Rhode Island Fishermen's Alliance is the state's largest commercial fishing industry advocacy organization, representing 150 members from the state's two major ports. It has been extensively involved in every major issue that has confronted Rhode Island's fishing community since its inception, including fisheries management, collaborative research on sustainable fishing, state and federal lobbying, and the establishment of festivals to promote awareness of the importance of this industry to the community. Many of its members are trawl fishermen who have worked in the area included within the monument designation. Based on the impacts of the first few months that this fishing has been prohibited, the alliance estimates that its fishermen will lose more than $3 million in annual income. The impact on the many businesses that depend on a thriving commercial fishing industry are likely to be three times that. Representing its members, the alliance participated in the limited public process during the President's consideration of the monument, including attending a town hall and meetings with representatives from the Council on Environmental Quality.

**Defendants**

14. Donald J. Trump is the President of the United States and is sued in his official capacity. His predecessor, President Barack Obama, issued the proclamation establishing the monument.

15. Wilbur J. Ross, Jr. is the Secretary of Commerce and, under the proclamation, is charged with enforcing the proclamation's fishing prohibitions. He is also required to issue a joint management plan for the monument.

16. Benjamin Friedman is the National Oceanic and Atmospheric Association's Deputy Undersecretary for Operations and is sued in his official capacity. The proclamation establishing the monument charges the Secretary of Commerce, through the National Oceanic and Atmospheric

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

Administration, with responsibility for managing the monument. Upon information and belief, Mr. Friedman exercises the authority over the monument given to the National Oceanic and Atmospheric Administration.

17. Ryan Zinke is the Secretary of Interior and is sued in his official capacity. The proclamation establishing the monument directs the Secretary of Commerce to consult with the Secretary of Interior on decisions about how to manage the monument. Together, the Secretaries are required to issue a joint management plan for the monument and implement the proclamation's fishing prohibitions.

18. Jane Doe is the Chairman for the Council on Environmental Quality which, on information and belief, consulted with the President and purportedly collected evidence to support the proclamation. Nancy Sutley, the chairman when the monument proclamation was issued, has since stepped down and no successor has been announced.

**Legal Background**

*The Antiquities Act of 1906*

19. Responding to reports of pueblo ruins looted in the southwest, Congress enacted the Antiquities Act of 1906 to empower the President to quickly and unilaterally protect these precious antiquities.

20. Under the Antiquities Act, the President may declare historic landmarks, historic structures, and other objects of historic or scientific interest "situated on land owned or controlled" by the federal government to be national monuments. 54 U.S.C. § 320301(a). To protect these objects, the President may reserve "parcels of land," if "confined to the smallest area compatible with the proper care and management of the objects to be protected." *Id.* § 320301(b). The statute also directs the agencies who manage the monument to issue uniform rules and regulations to carry out the purposes of the act. *Id.* § 320303.

21. The Antiquities Act "places discernible limits" on the President's power to declare monuments. *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002). Therefore, courts are "obligated to determine whether statutory restrictions have been violated." *Id.*

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

22. The first of those limits is that only "historic landmarks," "historic and prehistoric structures," and similar "objects of historic or scientific interest" may form the basis of a monument designation. 54 U.S.C. § 320301(a); *cf. Yates v. United States*, 135 S. Ct. 1074 (2015) (applying *noscitur a sociis* and statutory context to hold that a fish is not a "tangible object" in the context of the Sarbanes-Oxley Act).

23. The second limit is that a monument may only be designated for objects on "land owned or controlled by the Federal government[.]" 54 U.S.C. § 320301(a). Consistent with Congress' purpose of protecting historic Indian artifacts, this phrase includes Indian lands and federal territories that are controlled but not owned by the federal government. In 1906, most of the Southwest, where these objects were located, was Indian land or federal territory. The Antiquities Act does not authorize the President to designate monuments on anything other than lands "owned or controlled" by the federal government. A monument may not be designated on privately owned land. Nor may one be designated beyond the nation's territory, including the high seas. *Cf. Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330, 337-40 (5th Cir. 1978) (holding that the Antiquities Act does not apply to a 1622 shipwreck beyond the nation's territorial sea).

24. A third limit is that the area set aside for the monument must be "confined to the smallest area compatible with proper care and management of the objects to be protected[.]" 54 U.S.C. § 320301(b). Congress has twice amended the Antiquities Act in response to Presidents abusing this power by making huge monument designations. *See* 54 U.S.C. § 320301(d) (no monuments can be designated in Wyoming); 16 U.S.C. § 3213 (no monuments larger than 5,000 acres in Alaska).

*Federal authority over the high seas, including the Exclusive Economic Zone*

25. In 1906, the United States' territorial reach extended only three miles off the coast—the limits of the territorial sea. Beyond that was the high seas, which were international waters. By proclamation, President Reagan asserted that the territorial sea extends up to 12 miles off the coast. *See United States v. Alaska*, 521 U.S. 1, 8-9 (1997).

///

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

26. Under the Convention on the Law of the Sea—which has never been ratified by Congress—the next 188 miles from the coast are the Exclusive Economic Zone.

27. Nations enjoy limited regulatory authority over the Exclusive Economic Zone but do not have the level of sovereignty they enjoy within their territories. *See* Restatement (Third) of Foreign Relations Law § 514 cmt. c. For instance, nations may regulate oil drilling and fishing in this area but may not interfere with navigation or the laying of cables.

*Federal regulation of ocean fisheries*

28. Congress has exercised its limited authority to regulate the Exclusive Economic Zone to protect the environment by adopting statutes specifically directed to this area of the ocean and establishing procedures to protect against excess restrictions on its sustainable use.

29. In 1972, Congress adopted the National Marine Sanctuaries Act, which is aimed at protecting sensitive areas of the Exclusive Economic Zone to the extent the United States can. *See* 16 U.S.C. §§ 1431-1445(b). This statute permits the Secretary of Commerce to designate marine sanctuaries within the Exclusive Economic Zone based on twelve factors explicitly set out in the statute and only after providing notice to the public and consultation with state regulators. 16 U.S.C. §§ 1433-1434. If a marine sanctuary is established, the Regional Fishery Management Council, not the Secretary, has primary authority to regulate fishing to the extent required to protect it. 16 U.S.C. § 1434(a)(5). The statute encourages all public and private uses of the resources in a marine sanctuary, to the extent compatible with the sanctuary's protection.

30. In 1976, Congress enacted the Magnuson-Stevens Fishery Conservation and Management Act, which is more commonly known as the Magnuson-Stevens Act. 16 U.S.C. § 1801, *et seq*. This is the primary law governing fisheries management in the Exclusive Economic Zone. It is administered by eight regional fishery management councils, which must include representatives of federal and state agencies as well the fishing industry.

31. Pursuant to the Magnuson-Stevens Act, the regional councils prepare an annual stock assessment for each species commercially harvested in a fishery. If that assessment indicates that a species is being overfished, the regional council sets an annual catch limit. As a result of this

///

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

regulatory program, nearly 90% of fisheries managed under the statute maintain healthy, sustainable harvest levels below their annual catch limits.

32. In addition to regulating the levels of harvest, the regional councils regulate the gear used to fish, to reduce impacts to the ecosystem and incidental bycatch.

33. Unlike the Antiquities Act, these statutes refer to the ocean or Exclusive Economic Zone specifically, rather than "lands owned or controlled" by the federal government, and tailor the degree of environmental protection to the limited authority the federal government enjoys in this area.

**Factual Allegations**

*Georges Bank fishery*

34. The Georges Bank is an elevated area of sea floor off the Massachusetts coast that separates the Gulf of Maine from the Atlantic Ocean.

35. Like much of the continental shelf off the United States' east coast, canyons pockmark the Georges Bank's edge.

36. Although a few companies have explored for oil under the Georges Bank, none of those efforts have been successful. Consequently, the federal government has enforced a moratorium on further drilling and exploration for decades.

37. For centuries, the Georges Bank has supported lucrative fisheries. The iconic fishing communities of New England and throughout the East Coast sprang up because of the value of this fishery.

38. Today, this area supports significant fisheries for a wide variety of species of fish and shellfish. Those fisheries provide an important source of income and employment for fishermen throughout the northeast, including Plaintiffs' members.

39. The commercial fisheries are part of a rich ecosystem that also features whales, sharks, sea turtles, and other ocean species.

40. Beyond Georges Bank lie several seamounts rising from the ocean floor. These too support fish and other species. However, they are not the subject of significant commercial fishing.

41. Deep-sea coral grows on both the canyons and seamounts.

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

42. Fishermen are careful to avoid areas where coral is present because it severely damages their gear, costing the fishermen more than any benefit that could be obtained from fishing in this area.

*Existing management*

43. The New England Fishery Management Council manages the Georges Bank fishery under the Magnuson-Stevens Act. Since that statute was enacted, it has worked with industry, state and federal government, and nongovernment organizations to improve sustainability of the fishery. These efforts have included regulation of the equipment and methods fishermen use, the areas they use them, as well as enforcing catch limits.

44. The Atlantic States Marine Fisheries Commission manages lobster fishing on the Georges Bank under an interstate compact. It too has worked with industry, state and federal government, and nongovernmental organizations to improve sustainability. In particular, the Commission, working with several of the Plaintiffs, has retired traps in order to reduce pressures on the lobster stock. Those efforts have been very successful and the Commission's latest stock report shows record abundance of lobster in Georges Bank and the Gulf of Maine.

*Proposal to designate a monument in the North Atlantic*

45. In 2015, the penultimate year of former-President Obama's second term, several environmental groups petitioned the President to designate a monument in the Atlantic Ocean before his presidency ended.

46. The proposal met with substantial opposition from both government and industry.

47. On September 18, 2015, the Massachusetts Lobstermen's Association, joined by the Atlantic Offshore Lobstermen's Association and several other fishermen organizations, sent a letter to the Council on Environmental Quality opposing the potential monument. That letter explained the many steps taken by the industry groups, working with state and federal fisheries managers, to improve sustainability of this fishery. This has included developing a prohibition against harmful gear and improving fishing methods during the region. The fishery in this area is thriving precisely because of the success of these efforts. Exhibit 1 is an accurate copy of the Massachusetts Lobstermen's Association letter.

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

48. In November 2015, Governor Baker of Massachusetts sent a letter to the President criticizing the proposed monument designation, arguing that it would undermine ongoing efforts to sustainably manage the fishery.

49. On May 9, 2016, the Atlantic States Marine Fisheries Commission also submitted a letter on the potential designation of a monument designation. The letter noted that the New England Fishery Management Council is already working on an Omnibus Deep-Sea Coral Amendment to protect corals in all the canyons in its region, which could be frustrated by a monument designation. The letter specifically requested that any monument designation not prohibit mid-water or surface fishing methods, as these could not impact deep-sea coral.

50. On June 27, 2016, the eight Regional Fishery Management Councils jointly filed a letter on the possibility of a monument designation in the North Atlantic. That letter specifically noted that a monument designation would frustrate the Councils' efforts to responsibly regulate fisheries and ultimately harm the environment. Specifically, the Councils explained "[m]arine monument designations can be counterproductive as they may shift fishing effort to less sustainable practices . . ." Exhibit 2.

51. On September 14, 2016, the Southern Georges Bank Coalition, a group made up of many of the Plaintiffs and their members, sent the Council on Environmental Quality a letter opposing the potential monument designation. The Coalition argued that the Antiquities Act does not authorize the President to designate monuments beyond the nation's territorial sea and, even if it did, the proposed monument was too big to comply with the statute. The Coalition further argued that management of the fishery should remain under the public, collaborative, and science-based process established by the Magnuson-Stevens Act. Exhibit 3 is an accurate copy of the Southern Georges Bank Coalition letter.

*Northeast Canyons and Seamounts Marine National Monument*

52. Despite these objections, on September 15, 2016, President Obama issued a proclamation declaring the Northeast Canyons and Seamounts Marine National Monument. The proclamation describes the monument as consisting of two units. The Canyons unit includes three large underwater canyons and two smaller ones, and covers nearly 1,000 square miles

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

(approximately 640,000 acres). The Seamounts Unit includes four seamounts (underwater mountains) and covers nearly 4,000 square miles (approximately 2.56 million acres). Exhibit 4 is an accurate copy of the President's Proclamation.




53. The proclamation asserts that the canyons and seamounts, and the natural resources and ecosystems in and around them, are "objects of historic and scientific interest" and form the basis for the monument designation.

54. The three underwater canyons start at the edge of the continental shelf and drop thousands of meters to the ocean floor. The proclamation notes that deep-sea corals live in the canyon and form the foundation of a deep-sea ecosystem. The steep sides of the canyons concentrate phytoplankton, which draw fish, whales, and other ocean species.

55. The four seamounts are part of a larger seamount chain formed by extinct volcanoes. The seamounts also support deep-sea coral and several ecosystems.

///

///

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

56. The proclamation also asserts that the ecosystems in the huge area around the canyons and seamounts have drawn scientific interest. The ecosystem includes sharks, whales, turtles, and many highly migratory fish.

57. The proclamation offers no explanation for why this huge section of the ocean is "lands owned or controlled" by the federal government. Instead, it simply asserts that protecting the marine environment is in the public interest.

58. The proclamation offers no justification for why this roughly 5,000 square mile (3.2 million acre) area is the smallest area compatible with protecting the monument.

59. The proclamation divides the authority to manage the monument between the Secretaries of Commerce and Interior. The Secretary of Commerce, through the National Oceanic and Atmospheric Administration, is responsible for managing activities and species within the monument. The Secretary of Interior is responsible for managing the area pursuant to its statutory authorities. Together, the Secretaries are directed to prepare a joint management plan within 3 years and promulgate regulations to protect the monument.

60. Recognizing that the federal government's authority to regulate this area is limited by international law, the proclamation forbids the Secretaries from adopting and implementing any regulations which would exceed the federal government's authority even if necessary to protect the monument. In particular, the proclamation forbids the Secretaries from restricting the ships that can pass through the area or the planes that can fly over it or regulating any lawful uses of the high seas.

61. The proclamation directs the Secretaries to specifically prohibit: energy exploration and development within the monument; the taking or harvesting of any living or nonliving resources within the monument; drilling, anchoring, or dredging in the area, unless for scientific reasons or constructing or maintaining cables; and commercial fishing or the possession of commercial fishing gear, if available for immediate use.

62. The proclamation allows the Secretaries, according to their unconstrained discretion, to permit: research and scientific exploration; recreational fishing; commercial fishing with some gear types but not others for red crab, Jonah crab, and lobster, but only for the next

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

7 years; other activities that do not impact any resource within the monument; and the construction and maintenance of underwater cables.

63. On November 14, 2016, the proclamation's prohibition against all fishing in the area except for lobster and red crab went into effect. Since that time, none of the Plaintiffs' members who previously fished for other species in the area have been able to do so.

**Allegations Supporting Declaratory and Injunctive Relief**

64. Unless a permanent injunction is issued to forbid the implementation of the proclamation's fishing prohibitions, Plaintiffs are and will continue to be irreparably harmed. They are currently and continuously injured by the proclamation's restrictions. The fishermen are suffering and will continue to suffer a diminution of income, reduced fishing opportunities, and depletion of their investment in their boats and permits.

65. Plaintiffs have no plain, speedy, and adequate remedy at law.

66. If not enjoined by this Court, Defendants will continue to enforce the proclamation's fishing prohibitions and adopt regulations further restricting fishing within the monument.

67. An actual and substantial controversy exists between Plaintiffs and Defendants over the President's power to proclaim monuments in the ocean beyond the nation's territorial sea.

68. This case is currently justiciable because the proclamation is self-executing and immediately forbids many types of fishing within the monument and requires the Secretaries to phase out remaining fishing from the area over the next seven years. Plaintiffs are currently and continuously injured by the proclamation's fishing restrictions.

69. Injunctive and declaratory relief are therefore appropriate to resolve this controversy.

**Claim for Relief**

(Violation of the Antiquities Act, 54 U.S.C. §§ 320301-320303)

70. The Antiquities Act limits the President's authority to designate monuments to historic artifacts, historic landmarks, and similar objects of historic or scientific interest "situated on land owned or controlled by the Federal government." 54 U.S.C. § 320301(a). Any designation

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

must be "the smallest area compatible with proper care and management" of the objects protected by the monument. *Id.* § 320301(b).

**A. The President exceeded his power by designating a monument on the ocean rather than "lands owned or controlled" by the federal government**

71. The Northeast Canyons and Seamount National Marine Monument purports to designate a monument in the ocean 130 miles from the nation's coast. This area of the ocean is not "lands owned or controlled" by the federal government. Therefore, the Antiquities Act does not authorize the President to establish the Northeast Canyon and Seamounts Marine National Monument.

**B. The President exceeded his power by designating a monument that is not the smallest area compatible with the care and management of antiquities and similar objects of historic or scientific interest**

72. Even if the Antiquities Act authorized the President to declare a monument in the ocean beyond the territorial sea, the Northeast Canyons and Seamounts Marine National Monument would violate the statute because it is not "the smallest area compatible with proper care and management" of the canyons and seamounts on which it is purportedly based.

73. The monuments boundaries bear little relation to the canyons and seamounts, thereby prohibiting much fishing outside of these areas that would have no impact on the canyons, seamounts, or the coral that grows on them. Between Retriever and Mytilus Seamounts, for instance, the monument encompasses areas that are dozens of miles from the nearest seamount. Yet in other areas, the monument's boundary lies right next to a seamount excluding areas that are at most only several miles away.

74. Similarly, the monument's canyon unit broadly sweeps in the entire area between the canyons, as well as a significant area closer to shore than the canyons. Many of these areas are miles from the nearest canyon's edge and fishing would not adversely affect the canyons.

75. To the extent the monument's overly large size is not defended based on the canyons or seamounts but instead the area's marine ecosystem, that too would exceed the President's power under the Antiquities Act. An ecosystem is not an "object" under the Antiquities

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

Act. *Cf. Yates*, 135 S. Ct. 1074. The individual fish and shellfish that make up that ecosystem are also not "objects" for the purposes of the statute.

**Request for Relief**

Plaintiffs respectfully request the following relief:

1. A declaration that the Antiquities Act does not authorize the President to establish ocean monuments and that the establishment of the Northeast Canyons and Seamounts National Marine Monument is consequently unlawful;

2. An injunction forbidding the President, Secretary of Commerce, and Secretary of Interior from enforcing any of the proclamation's fishing prohibitions;

3. An injunction forbidding the Secretary of Commerce and Secretary of Interior from issuing any further regulations restricting fishing pursuant to the proclamation;

4. An award of attorney's fees, expenses, and costs; and

5. Any other relief the Court deems just and proper.

DATED: March 7, 2017.

Respectfully submitted,

/s/ Joshua P. Thompson

JONATHAN WOOD,* D.C. Bar No. 1045015
E-mail: jw@pacificlegal.org
TODD F. GAZIANO,* Tex. Bar No. 07742200
E-mail: tfg@pacificlegal.org
Pacific Legal Foundation
3033 Wilson Blvd., Suite 700
Arlington, Virginia 22201
Telephone: (202) 888-6881

*Pro hac vice* pending

JOSHUA P. THOMPSON, Cal. Bar No. 250955
E-mail: jpt@pacificlegal.org
DAMIEN M. SCHIFF,* Cal. Bar No. 235101
E-mail: dms@pacificlegal.org
JOHANNA B. TALCOTT,* Cal. Bar No. 311491
E-mail: jbt@pacificlegal.org
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111

Attorneys for Plaintiffs

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747